# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

ESTATE OF BRENDA HARDIN )
*Diana Searcy as Executrix*, )
v. )
 )
BROADMORE SENIOR SERVICES, LLC; ) No. 3:05-0382
SSA MURFREESBORO ALF, LLC d/b/a ) Consolidated with 3:06-0481
Broadmore Estates at Murfreesboro,[1] )

## MEMORANDUM

Pursuant to the provisions of 28 U.S.C. § 636 and Rule 73(b) of the Federal Rules of

Civil Procedure, the parties in this action have consented to have the Magistrate Judge

conduct any and all further proceedings in the action and the action has been referred to

the Magistrate Judge for all further proceedings, including entry of final judgment.  *See*

Order entered July 11, 2006.  (Docket Entry No. 22).

Pending before the Court is the Motion for Summary Judgment (Docket Entry

No. 33) on behalf of defendants Broadmore Senior Services, LLC, and SSA Murfreesboro

---

[1]This case was consolidated with *Estate of Brenda Hardin v. United States of America*, No. 3:06-cv-0481, by order entered February 12, 2007.  (Docket Entry No. 33, 3:06-0481). The plaintiff filed a motion to dismiss the action against the defendant United States of America without prejudice (Docket Entry No. 40), which the defendant opposed to the extent that dismissal was sought without prejudice (Docket Entry No. 41).  In further response, the plaintiff advised that she did not object to the dismissal with prejudice (Docket Entry No. 42).  By order entered July 6, 2007 (Docket Entry No. 43), the claims against the United States of America were dismissed with prejudice.

1

ALF, LLC, d/b/a Broadmore Estates at Murfreesboro ("the defendants" or "Broadmore"),[2] and the plaintiff's response (Docket Entry No. 37), which the Court construes in part as a cross motion for summary judgment on the issue of res ipsa loquitur.[3] The defendants filed a reply to the plaintiff's response. (Docket Entry No. 38.)

## I. BACKGROUND AND PROCEDURAL HISTORY

The plaintiff Diana Searcy is the executrix of the estate of Brenda Hardin and the late Ms. Hardin's sister.[4] Brenda Hardin was a resident of Broadmore Assisted Living Facility ("Broadmore") in Murfreesboro, Tennessee, from December 12, 2003, until June 2, 2004. On June 2, 2004, Ms. Hardin was discovered dead in her room. Ms. Hardin was fifty-four years old at the time of her death. *See* Docket Entry No. 21-2, 3:06-0481. An autopsy performed on June 3, 2004, by the Office of the State Medical Examiner concluded that the cause of her death was acute Citalopram intoxication. *See* Docket Entry No. 37-3 at ¶ 13.

---

[2]The relationship between the two defendants is not clear. *See* Docket Entry No. 37-3, at 1-2.

[3]In the plaintiff's response, she first generally objects to the defendants' motion, states her version of the undisputed material facts, and, in the process, claims she is entitled to summary judgment under the theory of res ipsa loquitur.

[4]Unless otherwise specified, the facts as set forth in this section are taken from the plaintiff's amended complaint (Docket Entry No. 3) and the defendants' response to requests for admissions (Docket Entry No. 37-3).

2

For the purposes of the defendants' motion for summary judgment, the defendants do not dispute that Citalopram overdose caused Ms. Hardin's death. *See* Docket Entry No. 34, at 4 n.10.

Ms. Hardin, a service-connected disabled veteran, received medical care from the Department of Veteran's Affairs Hospital ("VA"), and received her prescription medication through the VA Pharmacy. According to the Negotiated Service Plan executed by Ms. Hardin and Broadmore, her medications were provided by the VA Pharmacy to Broadmore, and a nurse would administer Ms. Hardin's sixteen scheduled medications and three as needed in her room. Docket Entry 19-2, at 11-12, 3:06-0481. Ms. Hardin had been diagnosed with paranoid type schizophrenia, and required a nurse to assist with her medication due to Ms. Hardin's noted forgetfulness about taking her medications. *Id.* A Broadmore nurse brought medication to Ms. Hardin's room daily in a small white cup, along with a cup of juice. *Id.* at 4-5. When Ms. Hardin entered Broadmore, she was independently performing most daily activities, such as personal hygiene, dressing, walking, bathing, and she was cleared to travel and shop independently with community assistance with transportation. *Id.* at 11-12.

Nurses or other personnel who were employees of Broadmore administered Ms. Hardin's medications during her residency at Broadmore. A record was maintained of medications administered. Broadmore stored residents' medications in a secure place,

3

and they were not available to Ms. Hardin or any other resident without the supervision of Broadmore employees. *See* Docket Entry No. 37-3, at 2-3.

Ms. Hardin's sister, the plaintiff in this case, cared for Ms. Hardin prior to her residency at Broadmore. Docket Entry No. 19-2, at 7, 3:06-0481. The plaintiff testified in her deposition that she did not believe that Ms. Hardin would have deliberately or accidentally overdosed. *Id.* at 10; Docket Entry No. 19-5 at 3, 5. She stated that her sister was conscientious about her medications, and would refuse to take a pill that was a different color than normal, or one that had fallen on the floor. Docket Entry No. 19-5, at 3-4. The plaintiff testified that she believed that Ms. Hardin was "scared of dying," but admitted that Ms. Hardin had suicidal thoughts. *Id.* at 5. However, the plaintiff concluded that she was "very confident that she would never have [taken her own life]." *Id.* at 6.

The plaintiff testified that she believed that someone gave her sister pills without her sister's knowledge, causing her fatal overdose. *Id.* at 8. The plaintiff was unable to supply any possible suspect or motive to support this belief, and she further testified about several specific instances of kindness or affection on the part of other residents and staff at Broadmore towards her sister. *Id.* at 7. The plaintiff did not have any prior suspicions that someone disliked or might have harmed her sister, and she admitted that she did not form these suspicions until after receiving the autopsy report and learning the cause of her sister's death. *Id.* at 6.

4

Records submitted by the VA pharmacy detailed all Citalopram prescribed and dispensed to Ms. Hardin in 2004.[5] Ms. Hardin's prescription was for one 40 mg capsule to be taken by mouth daily in the morning. Docket Entry 21-2, 3:06-0481. A prescription was filled and "released by mail," on January 30, 2004, and contained ninety days' worth of medication, or ninety 40 mg capsules. *Id.* On April 19, 2004, a refill of the same prescription by the same doctor was dispensed by mail. *Id.* at 3. Just four days later, on April 23, 2004, a different doctor provided a new prescription for Citalopram in 40 mg capsules.[6] *Id.* at 5. The new prescription had a different number and was "finished by" a different person than the person noted on the April 19 prescription. This prescription, also for ninety capsules, was dispensed by mail. *Id.* No mention of the previous prescription already on file with the VA Pharmacy was made in the records relating to the new prescription. In the notes following the original prescription, however, there is an entry made on April 23, 2004, that reads "Discontinued During New Prescription Entry - Duplicate Drug." *Id.* at 3-4. Presumably, when the new prescription was entered, the old prescription was "discontinued" in the computerized records.

_____

[5]The Court has been provided no records or other information indicating how much Citalopram was prescribed or dispensed to Ms. Hardin prior to 2004.

[6]There is no indication in the record why the second prescription was written on April 23, 2004.

However, even after a thorough review of the evidence of record and the filings of the parties, the Court cannot determine what action, if any, was taken by what party, if any, regarding the duplicate prescriptions and subsequent duplicate filling and mailing. According to the records submitted, the VA Pharmacy mailed two sets of ninety pills, for a total of one hundred and eighty pills prescribed and dispensed within the four-day period of April 19-23, 2004. Although on April 23, 2004, someone at the VA Pharmacy made a note on the original prescription discontinuing it due to the existence of the new, duplicate, prescription, it is not clear if any further action was taken. There is no evidence in the record nor any explanation about what happened to the pills once they reached Broadmore.

In her original and amended complaints,[7] the plaintiff sued for the wrongful death of her sister, alleging various types of negligence on the part of the defendants and their employees. The plaintiff also alleged that the doctrine of res ipsa loquitur should apply in these circumstances, and that she is entitled to summary judgment on this issue.

The plaintiff alleged several alternative theories in her complaint against the defendants. Count I is a claim of negligence asserting that the defendants owed a duty "to administer all of the plaintiff's medications to the plaintiff in a medically proper and careful

---

[7]The plaintiff filed an amended complaint (Docket Entry No. 3) nine days after the original complaint. The two complaints are essentially identical, save for an error in the original complaint listing the plaintiff's date of autopsy as preceding her date of death, and will be referred to herein as "the complaint."

6

manner," and "to secure and supervise the administration of the medications that Brenda Hardin was prescribed by her physicians," and asserting that they breached this duty, causing Ms. Hardin's death. Docket Entry No. 3, at 2-3. Count II pleads the doctrine of res ipsa loquitur, claiming that Ms. Hardin's medications were "under the exclusive control of the defendants, and since Brenda Hardin died from an overdose of one of those medications, the defendants should be presumed negligent." *Id*. at 3. Count III is another negligence claim alleging that the duty owed and breached was "to supervise [Broadmore's] employees such that their actions or omissions would bring no harm to Brenda Hardin," and that this breach caused the death of Ms. Hardin. *Id*. at 4. Count IV pleads vicarious liability, in the alternative, asserting that an intentional act of one or more employees of the defendant caused the plaintiff's death, rendering Broadmore vicariously liable. Count V alleges an alternative claim of negligence that one or more of the residents of Broadmore committed an intentional act that harmed Ms. Hardin, and asserts that the defendants had a duty to "carefully and adequately monitor the activities of the other residents living in the facility." *Id*. at 5.

The defendants contend that there is no evidence in the record and no competent expert testimony to support the plaintiff's claims against the defendants, entitling them to summary judgment. While the plaintiff attempts to couch her claims in terms of the common law standards of negligence and res ipsa loquitur, the defendant asserts that

Broadmore is an assisted living facility, and as such, "is regulated by the Tennessee Department of Health, Board for Licensing Health Care Facilities, and governed by the Standards for Assisted-Care Living Facilities, Chapter 1200-8-25." Docket Entry No. 34, at n. 1. Therefore, the defendants assert that this is a medical malpractice action, and the requirements of Tennessee's medical malpractice statute, which also codifies the doctrine of res ipsa loquitur, apply. *See* Tenn. Code Ann. § 26-26-115.

In her response, the plaintiff does not dispute the characterization of her complaint as a medical malpractice action. Docket Entry No. 37. Instead, the plaintiff spends a portion of her three and a half page response insisting that this Court must apply Tennessee state procedural law, rather than federal procedural law, in determining whether judgment as a matter of law is appropriate. The plaintiff reasserts her reliance upon the doctrine of res ipsa loquitur, and argues that "under that doctrine the court can infer from the record that the defendants were negligent and can award summary judgment to the plaintiff on the issue of liability." The plaintiff further argues that once the doctrine is invoked, a rebuttable presumption of negligence arises. The plaintiff contends that the defendant has not rebutted the presumption and that summary judgment in her favor is therefore appropriate. Docket Entry No. 37, at 3-4.

## II. SUMMARY JUDGMENT STANDARD

The plaintiff dedicates part of her response to the argument that Tennessee procedural law governs this action.[8]  Although "state law governs substantive issues in diversity suits, federal procedural law applies."  *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 296 n. 1 (6th Cir. 2007) (citing, *inter alia, Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)).[9]  Specifically, Rule 56 of the Federal Rules of Civil Procedure applies in diversity cases.  *See Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165-66 (6th Cir. 1993); *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 459 (6th Cir. 1986).  The Court will apply the substantive law of Tennessee with respect to the claims raised in this case, but the appropriate summary judgment standard to be applied for purposes of the pending motions is the federal standard.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

---

[8]The plaintiff contends that, under Tennessee law, summary judgment cannot be granted to the defendants unless the defendants can "affirmatively negate an essential element" of the plaintiff's claim or "establish an affirmative defense that conclusively defeats" the plaintiff's claim, which the plaintiff argues the defendants have failed to do. Docket Entry No. 37, at 2.

[9]The plaintiff is correct that the Sixth Circuit follows a minority rule by applying state standards of review in diversity cases when addressing motions under Rule 50 of the Federal Rules of Civil Procedure.  *See King v. Ford Motor Co.*, 209 F.3d 886, 893 (6th Cir. 2000); *Morales v. American Honda Motor Co.*, 151 F.3d 500, 506 (6th Cir. 1998).

9

material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the Court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere

10

existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the [finder of fact] could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fairminded finder of fact to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir.1999) (citing *Anderson*, 477 U.S. at 247-49).

## III. ANALYSIS

In this action for the alleged wrongful death of her sister, the plaintiff alleges that her sister, Brenda Hardin, died of an overdose of one of her prescribed medications due to the negligence of Broadmore, the assisted living facility where her sister resided at the time of her death. *See* Docket Entry No. 3. The plaintiff's amended complaint contains five counts, essentially broken down into three claims of negligence, a claim that the doctrine of res ipsa loquitur applies, and a claim asserting the vicarious liability of Broadmore for alleged intentional acts of its employees.

## A. Count I – Negligence and Medical Malpractice under Tennessee law

In a negligence claim, a plaintiff must prove five elements: (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of the duty; (3) an injury or loss; (4) causation in fact; and (5) proximate causation. *See, e.g, Henry v. Bi-Distr. Bd. of Urban Ministry*, 54 S.W.3d 287, 289-290 (Tenn. Ct. App. 2001) (citing *Rice v. Sabir*, 979 S.W.2d 305, 308 (Tenn. 1998)).

Medical malpractice claims are a specialized type of negligence action. Medical malpractice actions in Tennessee are specifically controlled by the medical malpractice statute, which essentially codifies the common law elements of negligence. Tenn. Code Ann. § 29-26-115. Section 29-26-115 requires that the plaintiff prove: (1) the recognized standard of professional care; (2) that the defendant failed to act in accordance with the applicable standard of care; and (3) that as a proximate result of the defendant's negligent act or omissions, the plaintiff suffered an injury which otherwise would not have occurred.

As the Tennessee courts have recognized, "the distinction between medical malpractice and negligence is a subtle one, for medical malpractice is but a species of negligence and 'no rigid analytical line separates the two.'" *Gunter v. Lab. Corp. of America*, 121 S.W.3d 636, 639 (Tenn. 2003) (quoting *Weiner v. Lenox Hill Hosp.*, 673 N.E.2d 914, 916 (N.Y. 1996)). Not all cases involving health or medical entities are medical malpractice cases. *See, e.g., Gunter*, 121 S.W.3d at 640 (citations omitted); *Pullins v. Fentress County Gen.*

12

*Hosp.*, 594 S.W.2d 663 (Tenn. 1979) (hospital's failure to keep premises free of spiders sounds in ordinary negligence and not medical malpractice); *Estate of Doe v. Vanderbilt Univ.*, 958 S.W.2d 117 (Tenn. Ct. App. 1997) (defendant's decision not to notify patients potentially infected with HIV-tainted blood was not subject to the provisions of the Tennessee Medical Malpractice Act); *Peete v. Shelby County Health Care Corp.*, 938 S.W.2d 693 (Tenn. Ct. App. 1996) (defendant's attempt to dismantle orthopedic suspension bar was ordinary negligence). However, the medical malpractice statute may extend to acts of non-physicians when they are involved in the medical treatment of a patient. *See Gunter*, 121 S.W.3d at 640.

In *Gunter*, the plaintiff was determined to be the father of a child based on a DNA test, and he brought an action against the testing laboratory alleging that the lab negligently performed the test and overstated the probability of his paternity. The Tennessee Supreme Court ultimately concluded that the action was one for negligence rather than medical malpractice, and in doing so, set forth the standard for distinguishing between claims of ordinary negligence and those for medical malpractice. *Id*. at 638. After undertaking a review of cases, the *Gunter* court concluded that "[w]hen a plaintiff's claim is for injuries resulting from negligent medical treatment, the claim sounds in medical malpractice," and "[w]hen a plaintiff's claim is for injuries resulting from negligent acts that did not affect the medical treatment of a patient, the claim sounds in ordinary negligence." *Id*. at 640

13

(citations omitted). Further, the Tennessee Supreme Court embraced the analysis as set forth by the courts of the state of New York in other cases, and announced that

> [W]hen a claim alleges negligent conduct which constitutes or bears a substantial relationship to the rendition of medical treatment by a medical professional, the medical malpractice statute is applicable. Conversely, when the conduct alleged is not substantially related to the rendition of medical treatment by a medical professional, the medical malpractice statute does not apply.

*Id.* at 641. In *Gunter*, the Court concluded that the blood testing procedure did not "implicate issues of medical competence or judgment linked to Gunter's treatment," and concluded that the medical malpractice statute did not apply. *Id.*

The initial determination, therefore, is whether an action sounds in negligence or in medical malpractice. This question is governed by the *Gunter* "constitutes or bears a substantial relationship to medical treatment" standard. *See Patterson v. Arif*, 173 S.W.3d 8, 11 (Tenn. Ct. App. 2005) (quoting *Gunter*, and holding that, when a doctor sent a patient to a hospital that was not the closest one to the doctor's office and the patient stopped breathing upon exiting the doctor's parking lot, the claim sounded in medical malpractice and therefore called for competent expert proof).

In this case, the plaintiff alleges that Broadmore owed the plaintiff a duty "to administer all of the plaintiff's medications to the plaintiff in a medically proper and careful manner." *Id.* at ¶ 8. The same count also alleges a duty "to secure and supervise the

14

administration of Citalopram" and other prescription medications, and claims that the breach of this duty caused Ms. Hardin's death. *Id*. at ¶ 11-14.

In their motion for summary judgment, the defendants object to the characterization of the plaintiff's claims as sounding in mere negligence, and contend that, because Broadmore is an assisted living facility, regulated and governed by the rules of the Tennessee Department of Heath, the claims against Broadmore are claims for medical malpractice, and as such, should be governed by the requirements of Tenn. Code Ann. § 29-26-155.[10] Docket Entry No. 34, at n.1. Specifically, the defendants assert that expert testimony is required under section 29-26-115(b). *Id.* at n.2.

The characterization of a claim as one for negligence or as one for medical malpractice is a fact-sensitive inquiry, and the distinction is not always clear. The Court is not wholly persuaded by the defendants' argument that this is an action for medical malpractice simply because of Broadmore's status as an assisted living facility. Tennessee law is clear that not all actions against doctors and hospitals automatically fall under the medical malpractice statute. Furthermore, even though they are licensed, regulated, and

---

[10]Broadmore is an Assisted Care Living Facility ("ACLF") subject to Tennessee's statutory and regulatory licensing schemes and falls under the Department of Health, Division of Health Care Facilities. Tenn. Code Ann. §§ 68-11-201(4)-(5). An ACLF is defined, in part, as an establishment that accepts primarily aged persons for domiciliary care. ACLFs provide on-site services such as room, board, non-medical living assistance according to residents' needs, and medical services as prescribed by each resident's treating physician. *Id.*

15

often employ doctors and nurses and provide certain types of medical treatment, assisted living facilities are not the same as hospitals. The critical inquiry does not focus on the identity and status of the defendant, but rather, the nature of the claim itself.

The plaintiff, in her response, does not dispute the defendant's characterization of this case as one for medical malpractice requiring expert testimony. *See* Docket Entry No. 37. Nor does she respond to the defendants' assertions that she failed to present evidence to support her allegations that one or more of Broadmore's employees intentionally caused the death of Ms. Hardin (giving rise to vicarious liability), that one or more other residents intentionally caused the death of Ms. Hardin, or that Broadmore had exclusive control of the Citalopram pills that caused Ms. Hardin's death (an essential element of her assertion that res ipsa applies). Instead, the plaintiff focuses on the administration of Ms. Hardin's medications by Broadmore nurses and employees, and asserts that res ipsa should not only apply, but that she is also entitled to summary judgment on that issue.

Despite the fact that the plaintiff apparently does not dispute it, the Court specifically finds that the plaintiff's first count of negligence sounds in medical malpractice. The standard in Tennessee for distinguishing a claim for medical malpractice from one for simple negligence is set forth in *Gunter*, *supra*. The pivotal inquiry is whether the conduct in question "constitutes or bears a substantial relationship to the rendition of medical

16

treatment by a medical professional." 121 S.W.3d at 641. If so, the medical malpractice statute is applicable.

Here, the conduct in question with respect to Count I is the improper administration of prescription medications. Applying the standard as set forth in *Gunter*, the Court finds that the administration of prescription medications to a mentally ill resident of an assisted living facility is conduct that constitutes or bears a substantial relationship to the rendition of medical treatment by a medical professional. Therefore, the plaintiff has the burden of proof to establish the elements set forth in Tenn. Code Ann. § 29-26-115, and must do so through the use of a qualified expert.[11] Because the plaintiff has failed to proffer any expert whatsoever, this claim fails as a matter of law, and summary judgment is appropriate.

### B. Count II – Res Ipsa Loquitur

The doctrine of res ipsa loquitur (literally, the thing speaks for itself) under Tennessee law is a form of circumstantial evidence that allows a finder of fact to infer negligence from the circumstances of an injury. *Seavers v. Methodist Med. Cent. of Oak Ridge*, 9 S.W.3d 86, 91 (Tenn. 1999) (collecting other Tennessee cases). The doctrine is typically

---

[11]Although Tennessee courts still recognize a "common knowledge" exception to the expert testimony requirement, this exception is neither raised by the parties nor relevant in this case, since this is not a case in which medical negligence is as blatant as the proverbial "fly floating in a bowl of buttermilk." *See Patterson*, 173 S.W.3d at 12. *See also Seavers v. Methodist Med. Cent. of Oak Ridge*, 9 S.W.3d 86, 93 n.10 (Tenn. 1999).

17

available in cases in which direct evidence of a defendant's negligence is either inaccessible to or unknown by the plaintiff. *Id.* (citations omitted). The plaintiff's burden of proof is not abolished; the doctrine simply allows the finder of fact to infer negligence where there is "a common knowledge or understanding that events which resulted in the plaintiff's injury do not ordinarily occur unless someone was negligent." *Id.* (collecting cases and other authority). Merely proving injury is not enough to give rise to the inference. *Id.* The plaintiff must present circumstances from which the finder of fact might reasonably conclude that the defendant was negligent. *Id.*

The relevant test is two-fold. The plaintiff must demonstrate (1) that she was injured by an instrumentality that was within the defendant's exclusive control and (2) that the injury would not ordinarily have occurred in the absence of negligence. *Id.* (citations omitted).

The doctrine of res ipsa loquitur has been applied in a variety of negligence actions, and it also may be applied in the context of a medical malpractice action. *Id.* at 91-92. Res ipsa in the medical malpractice context has been codified in Tenn. Code Ann. § 29-26-115(c):

> In a malpractice action . . . there shall be no presumption of negligence on the part of the defendant; provided, there shall be a rebuttable presumption that the defendant was negligent where it is shown by the proof that the instrumentality causing injury was in the defendant's (or defendants') exclusive control and that the accident or injury was one which ordinarily doesn't occur in the absence of negligence.

18

The plaintiff has moved for summary judgment on the issue of res ipsa loquitur. *See* Docket Entry No. 37 at ¶ 10. However, the plaintiff incorrectly characterizes the doctrine as set forth under Tennessee law. Under both the common law and the statutory language, a plaintiff must show both that the defendant had exclusive control of the injury-causing instrumentality and that the injury would not have occurred in the absence of negligence. *See* Tenn. Code Ann. § 29-26-115(c); *Seavers*, 9 S.W.3d at 91. Res ipsa is available merely to afford the plaintiff a presumption of negligence. Even if the plaintiff were afforded the presumption, it would not, as she says, entitle her to summary judgment in her favor at this stage, but would merely allow the finder of fact to infer negligence. In other words, res ipsa is not a determination that may be made as a matter of law at the summary judgment stage, but rather an allowed presumption available only under very specific circumstances to enable a case to be presented to a finder of fact, and allow the finder of fact to infer negligence from the circumstances presented by the plaintiff.

Here, the plaintiff has not met her burden of demonstrating either necessary element. First, the plaintiff would have to show that the injury-causing instrumentality, an excess of Citalopram pills, was under the exclusive control of Broadmore. Although the parties agree that Broadmore maintained possession of and administered Ms. Hardin's medications, maintained them in a secure place, and maintained a record of administered

19

medications,[12] this is still simply not enough to show that Broadmore had exclusive control of the excessive amounts of Citalopram that caused Ms. Hardin's death.[13] The Court finds that the plaintiff has failed to demonstrate exclusive control of a commercially-available prescription drug to a resident of an assisted living facility capable of leaving the facility, receiving visitors and mail, and having any number of other outside contacts.

Similarly, the plaintiff has failed to show that the injury was not of a kind that ordinarily would not have occurred in the absence of negligence. Accepting as true that Ms. Hardin died of an overdose of Citalopram, a prescription drug, the Court cannot find that this is the type of injury which ordinarily would not occur but for negligence. Prescription drug overdoses, unlike the classic res ipsa injury of a sponge in the abdomen following surgery, happen for many reasons. It is simply not the type of injury contemplated by the case law or the legislature.

The Court finds that the plaintiff has failed to carry her burden of demonstrating that res ipsa applies in this case. Therefore, the defendant is entitled to summary judgment on this count.

_____

[12]*See* Docket Entry No. 37-3 at 2-3.

[13]Hypothetically, the plaintiff could have hoarded her medication and intentionally or unintentionally self-administered the fatal dose, a third party might have provided and/or administered the medication, or Ms. Hardin's doctor could have prescribed a fatal dosage. In all of these situations, the control of the instrumentality causing Ms. Hardin's death was not exclusively in the hands of Broadmore as must be shown under the theory of res ipsa loquitur.

20

## C. Count III – Negligent Supervision of Employees

In Count III, the plaintiff alleges that the defendants had a duty of care to supervise their employees such that their acts or omissions would bring no harm to Brenda Hardin. It is not clear whether, if summary judgment is granted to the defendants on Count I, if Count III survives as an independent cause of action.[14]  Although Tennessee courts have not specifically defined the elements of a claim for negligent supervision, *Borg v. J.P. Morgan Chase & Co.*, 2006 WL 2052856 at *12 (W.D. Tenn. July 21, 2006), a plaintiff "must show that the injury was a reasonably foreseeable probability, not just a remote possibility, and that some action within the [defendant's] power more probably than not would have prevented the injury." *See Phipps v. Walker*, 1996 WL 155258 (Tenn. Ct. App., Apr. 4, 1996); *Tedder v. Raskin*, 728 S.W.2d 343, 348-49 (Tenn. Ct. App. 1987).

The plaintiff has failed to even allege sufficient facts to allow the Court to engage in any sort of meaningful analysis.  The explanation for the toxic levels of Citalopram in Ms. Hardin's body remains a mystery.  The plaintiff has proffered no evidence, no facts, and not even any theories to support her claim of negligent supervision.  Instead, the plaintiff essentially concludes that an employee must have been responsible.  Because so

---

[14]It is not clear whether the negligent supervision claim implies that an employee committed an intentional act of providing Ms. Hardin an excessive amount of Citalopram or that an employee was simply negligent.  If the plaintiff is asserting that the defendants negligently failed to supervise its employees to protect against their negligence, it would seem that this claim would not survive once summary judgment is granted to the defendants on Count I.

Case 3:05-cv-00382   Document 45   Filed 07/19/07   Page 21 of 24 PageID #: 129

much remains unexplained, even if the Court views the facts in the light most favorable to the plaintiff, and ignores other facts, such as the plaintiff's own testimony that the employees of Broadmore exhibited nothing but kindness towards her sister,[15] the evidence simply does not give rise to any genuine issues of material fact.

### D.  Count IV – Respondeat Superior

Under the doctrine of respondeat superior, an employer is held vicariously liable for torts committed by its employees within the course and scope of their employment. *Tennessee Farmers Mut. Ins. Co. v. American Mut. Liab. Ins. Co.*, 840 S.W.2d 933, 937 (Tenn. Ct. App. 1992).  However, when an employee deviates from his line of duty and engages in a mission of his own, the employer cannot be held liable under respondeat superior.  *See Craig v. Gentry*, 792 S.W.2d 77, 79 (Tenn. Ct. App. 1990).  Generally, the question of whether an employee is acting within the scope of his employment is a question of fact for the trier of fact, but when the employee's departure from the employer's business is of such a "marked and decided character" that reasonable minds could reach but one conclusion

---

[15]*See* Docket Entry No. 19-5, at 7, in case 3:06-0481 (one employee, possibly a nurse, painted Ms. Hardin's toenails, everyone always told the plaintiff how much they enjoyed her sister being there, and the chef in the dining room was especially nice to Ms. Hardin and gave her second helpings).

under the undisputed facts, summary judgment is proper. *Id.* at 80; *Tennessee Farmers*, 840 S.W.2d at 936-37.

The plaintiff's claim in this count fails as it is plead. The plaintiff alleges that the death of Ms. Hardin was "the result of intentional acts of one or more employees of the defendants and that the defendants are therefore vicariously liable for the harm caused by those acts under the doctrine of respondeat superior." Docket Entry No. 3 ¶ 22. An employee intentionally causing the death of a resident of its employer is an act of such clear departure from the employer's business that reasonable minds could come to but one conclusion, i.e., that any such employee was not acting with the scope of his or her employment. Therefore, the plaintiff's claim for liability under respondeat superior fails.

### E. Count V – Negligent Supervision of Residents

In this count, the plaintiff alleges that Ms. Hardin's death was the result of an intentional act of a fellow resident of Broadmore. As with her preceding claims, the plaintiff's lack of evidence prevents meaningful analysis. In fact, the only mention of the other residents contained in the entire record comes from the plaintiff herself, and she testified that people in the hallways used to stop her and say positive things about her sister, and that she never heard any complaints about her sister. Docket Entry No. 19-5, at 7, 3:06-0481. The plaintiff's assertions that someone else killed her sister, whether a

23

Broadmore employee or a fellow resident, appear to stem from her own conviction that her sister would not have killed herself and the lack of any other reasonable explanation for her sister's death. These claims, without more, simply do not give rise to a genuine issue of material fact.

The plaintiff must present evidence sufficient to show that a genuine issue of material fact exists and that she could succeed on the merits of her claims based on the evidence presented. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252. The plaintiff is not entitled to a trial solely on the basis of her allegations and speculations. *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 861 (6th Cir. 1986).

## III. CONCLUSION

The plaintiff has failed to offer proof establishing the existence of any genuine issues of material fact. The defendants are entitled to summary judgment.

An appropriate order will enter.

Juliet Griffin
United States Magistrate Judge

24